Ma'am Clerk, please recall the case. First, it's Kino-Silk, No. 2. In re Marriage of Becky Woolsey, Talent Breakfast for Silken and Reductibility to Adelaide by Charles Sterling. Please proceed. Thank you. May it please the Court, Counsel, good afternoon. My name is Christopher Silken. I represent the appellate, Baird Woolsey. The question in this case, primarily, is whether or not Illinois courts should treat a retiring spouse who retires at what we're going to call a customary retirement age differently than they presently treat someone who retires at a non-customary age. Briefly, the facts in this case are, Edgar Baird Woolsey, at age 68, retired. He had a bacterial infection known as C. diff that was causing him significant problems. He was treating for mental health issues, and he was involved in a rather stressful job selling life insurance and other investment policies. And in the midst of his divorce, he decided, now is the time I'm going to retire. The trial court, in considering his divorce, made some statements such as, the trial court judge believed, excuse me, that Baird was, quote, that it would not be appropriate to order him to continue to earn at the rate that he was given his age, and that Baird was entitled to make the decision to retire at age 68. Now, given that I'm in front of you, you probably realize that is not the decision that was made. The trial court held that his retirement was in bad faith and imputed income to him as if he continued to work. Income that he never earned and was never going to earn because of his retirement. Now, current Illinois law follows a case known as Smith. Smith sets forth some factors the trial courts are supposed to review to determine if a retirement is indeed in bad faith. Those factors are age, health, motives in retiring, timing of retirement, the ability to pay maintenance after retirement, and the ability of the spouse to provide for themselves. The issue with these factors is that most of them have no bearing on a retirement of someone at an advanced age at a normal customary retirement age. Age and health are certainly primary issues for someone retiring at age 68. But the other factors really are outcome determinative. For example, the timing of retirement. The opposing spouse is always going to say, well, you timed this to be during our dissolution proceeding. The motives in retirement, they're going to say, well, your motive is obviously to defraud the marital estate. Now, the other side is going to say, no, my motive is I'm at a retirement age and I'd like to slow down with work. Well, with that being said, what's our standard of review on this issue? Standard review is abuse of discretion manifestly. The final factor would be for the ability of the other spouse to provide for themselves. And again, these seem to be, to me, outcome determinative. It would be a situation where a wealthy individual apparently would be allowed to retire, but someone who is not as wealthy, even though they're at that same advanced age, they might say, well, you've got to keep on working because you don't have the ability to pay as much maintenance as we'd like you to. I've cited a number of cases in my written materials from other jurisdictions, which we all know are not authoritative and are merely persuasive. But I think some of them are very persuasive, particularly the reasoning in the California case. And what California has held is that at age 65, that is a bright line age at which the trial courts cannot impute income past that point. And the logic used there was, why should a divorced spouse expect to receive more money than they would have had they remained married? Had they remained married and this individual was going to retire, the marital income was going to decrease. However, because they're divorcing, the other spouse now comes in and says, no, wait a minute, you should have kept working. This is in bad faith. We want to impute income to you. And California says, no, we're not going to allow that at 65, all things being equal, is the cutoff date. I cited a number of other states, Florida. Was that a statutory or common law decision? I believe it was a common law decision, Your Honor. I don't think off the top of my head that any of the cases that I cited were statutory. I think they were all common law. I could be mistaken. But Massachusetts and Florida follow laws similar to California in stating that even if this reduces the earnings of the other spouse, as a matter of law in those states, we're not going to say that you can't retire even though you're at that age. You have to keep on working. A number of other states, Tennessee, Colorado, Minnesota, Kentucky, they don't have such bright line rules, but what they say is that we're going to give greater deference to someone that retires at that age. I would submit to the court that the bright line rule would make the most sense because there's always going to be an argument that if it was indeed a fraud, or even if it wasn't a fraud, if the retiring spouse goes back to work, I don't think anyone would argue that that's not a change in circumstances for purposes of maintenance. So if we had a bright line rule that said you hit age 65, we're going to presume your retirement's in good faith, but if it is not, you can be opened up to being brought back in here under a change of circumstances, and we're going to increase your maintenance, potentially retroactively, if you kept on working. I think that would be easily workable for the trial courts so we don't run into situations where in one part of the state, someone says 68, yes, that's a customary retirement age. Another part, 66, no, that's not good enough. And the cases that I cited from the other jurisdictions show that there can be a vast difference between the courts and what they believe is customary. I believe the Kentucky case was 59 years old, and they said, well, that's not as old as some, but that's old enough. We think that's close enough. So I would submit that what current Illinois law is under Smith has led to the issue that we have in this case where the trial judge clearly believed at age 68, Baird Woolsey should be entitled to make the decision to retire, but the court found that following the Smith factors, that this retirement was in bad faith. So I would argue that Illinois should embrace age 65 as that date for customary retirement age and say that if you retire at that age, we're going to say that that is deemed reasonable unless you come back later and you're not retiring, you can be brought back in under a change of circumstances. The imputed income rules in Illinois follow a similar track as Smith in that I don't think they're applicable to a situation of a customary age retirement. The three factors that the court would have to find, but find one of them in order to impute income, are voluntary unemployment, an attempt to avoid a support obligation, or unreasonably failing to take advantage of an employment opportunity. I don't know that anyone would consider retirement voluntarily being unemployed, although that is technically what it is. Following that factor, any trial court could say, you're retired, why aren't you working? Retirement is voluntary unemployment. Get back to work. We're going to impute income. I don't think anyone would reasonably take that tact, as we know how modern retirement works, and just human beings in general. After a lifetime of work, you should be entitled to take some time off. That's how retirement has been treated in this country. That's how we continue to treat it. But, I mean, historically, people that labor with their backs, as opposed to judges, for example, people with more sedentary jobs tend to see them work longer. That's true, and there have also been cases that discuss firefighters, police officers, individuals who certainly have more strenuous work, and I think there would certainly have to be an exception that a customary retirement age for someone of that nature would have to be more ample. So it sounds to me like you're looking to keep you on a bright line rule. I think there are two options. I think the bright line rule with the caveat that the spouse can be brought back in under a change of circumstances to change maintenance would be the most workable, simply because it would be uniform. The changes to the Marriage and Dissolution Act with maintenance were meant to bring uniformity to the state, and I think that would ensure that. But a non-bright line rule, I would concede, would certainly be better than what we currently have. All these procedures are statutory, right? Divorce, maintenance, all that.  Yada, yada, yada. And wouldn't you think that if there's going to be a bright line rule, that would be a good job for the general assembly and not the courts? It wouldn't be if we could get them to do that, Your Honor, but the current law that we're laboring under is common law, that these cases all go back to Smith, and that's the standard that's being used to decide these retirements. No statutory factor that I'm aware of has been applied. Now, I understand that it is once again legislative amendment season, as I noticed they changed the law. Well, the application for maintenance and things like that. Yes, those were recently amended. They're going to be changed again, I think, in 2018, they go into effect. But I don't think those numbers about the length of the marriage and how long we multiply the maintenance to, I think, again, those are going to run into the same problems that we have in this case with a later life marriage, that the parties weren't married for all that long and Baird is substantially older. You're going to run into the same issue in that case if the legislature doesn't act and if we are stuck under the common law case law precedent that we're relying on now, that you're still going to have these issues in short-term marriages. That actually does bring up an interesting point, though, about the calculation of the maintenance period because what happened in this case to change subjects is the court followed statutory factors and said this is the length of the marriage, and when we look down the statute, two years, seven months, that's the length of maintenance. But what the court did was said that that maintenance period runs from the date of the order, not from the date that the action commenced, which is what the statute says. So, in effect, what the trial court did was double the maintenance period because of how long it took to reach that order from when the proceeding was commenced. That, in itself, was just simply error and violation of the statute, and the maintenance period should have been calculated from the time that it commenced. That would obviate some of the imputation of income issues because that is how long the maintenance period would run. And that's by statute? And that is by statute, correct. What is the justification for differing from the statute? Nothing, and the issue there is that the statute says there has to be a written finding as to the reason why you are deviating from the statute. There was no written finding. In fact, the opposite occurred. If you read the order, it says that the court is following the statutory factors, which is absolutely what it did when it determined this is the length of maintenance because it went right down the statutory formula. The court also failed to follow the statute in another manner. It set no termination date, and it also set no review date for maintenance. What the order says is that the judge was not ordering that maintenance continue after it expires. However, I'm not ordering that it expires on that date either. So, Barron-Mosey has no idea what's going to happen after that period. Now, the statute says that the court can order a review date, but the court didn't do that. It just says that when that date occurs, it doesn't extend, it doesn't terminate. What is left to happen, I don't know. My client doesn't know. My client has likely opened himself to a contempt sanction regardless of what he does on that date. If he stops paying, he's going to say, well, this says it doesn't extend. But, of course, the other side is going to say, well, it doesn't terminate either. The court should have followed the statute and either entered a termination date and said it's over on this date or ordered a review period. And, again, that's statutory, something that the court should have done and simply could not do. Can I ask you to go back to the previous issue about the date that maintenance starts? Yes. Temporary maintenance was $1,000 less than what the permanent maintenance was. Correct. If the trial court had said that permanent maintenance, which was $1,000 more, should reflect back to February 13th of 2015 and extend out for two years and nine months beyond September 14th, would you have any problem with that order? I mean, the number, two years and nine months, the judge could have adjusted that to add the 18 months before. Would you have a problem with the order if he had added 18 months to the two years, nine months, and increased the maintenance by $1,000? I would have a problem with the order in that that would be not following the statute. Why not? Because the statute sets forth the maintenance length based on the start of the proceedings, and then a factor of multiplying how long the marriage was. And that period would have to run from then. But I would concede that the judge had the authority to say, I'm not going to follow the statute. The problem is, in order to do that, he would have to say, here's why, X, Y, and Z. And he just didn't do that, and he did the opposite and said, I'm going to follow the statute, and then did that differently. So, yes, he would have the authority to do that if he had chosen to do that. Counselor, you have two minutes. Thank you. The judge gave no reason that he was going to follow the statute. Correct. The actual written order says this occurred pursuant to the statute, and that this was done pursuant to the statute. So he gave no reasoning to deviate from the statute beyond that. One of the probably more important legal issues in this case is the Social Security hot potato. As the Court is probably aware, there was a Supreme Court case known as Mueller that said, in one very last sentence that implicates a lot of cases, that courts in Illinois should just not concern themselves with Social Security, that's a supremacy clause issue, Congress should decide that, and we should just stay out of it. This case decided a case shortly after that, in which I believe Justice McDade in a concurrence said, I'm a little worried about that. Mueller language doesn't extend to maintenance. That was very prescient, because here I am complaining about that. I'm affirmed that it does extend to maintenance. I think that that is a supremacy clause issue that the United States Congress will need to be called upon  The state courts in Illinois simply don't have the authority to do that. Unfortunately, that's going to result in cases on both sides where it seems unfair. The Supreme Court noted that, especially in the Mueller case, in which one party had an undividable pension, and the other party says, well, I should get a discount based on what Social Security would have paid, and the Court just said, no, you just can't do that. I think, obviously, I can see that that's going to be harsh in certain cases, but we don't have the ability to tell Congress or to change their laws that say, no legal process can get to Social Security payments. Well, but that doesn't stop a court from saying, we're going to take into account maintenance with your needs, and knowing you're going to get X dollars in Social Security, I'm going to give you $3,000 a month because you're getting X thousand in Social Security, so I'm giving you 3,000 minus X, and that will give you what you need to live on. That's not touching Social Security. That's just using a little Kentucky windage to get where you're going. I think it does. I think the language of the Social Security rules when they talk about any legal process would extend to any determination of maintenance, and if you look at the cases cited in Mueller that discuss the reasoning of some of the older Social Security cases that talk about, well, you can consider it, but you can't really consider it, and Mueller said, that doesn't make any sense, that how can we say that you can consider it in, just to show you an example, that we can consider it, but then we have all these rules that say no legal process can touch it, and I think the Supreme Court's ruling was simply, this doesn't comport with supremacy. It's not like, you know, you've got a pension, and some of the issues are equivalent or something, and orders of pension, you know, okay, you're going to pay this much to your pensioner and this much to their ex-father, and under this, my hypothetical, you're not issuing process on Social Security and telling them, you know, okay, this person's got X dollars coming per month from Social Security, they get actually one-half X, and you've got to send the other one-half back to this person by virtue of this court order in the circuit court of the country, the Circuit of Peoria, because Social Security's going to thumb their nose at that, but nobody's asked them to do that. They're just saying, we're using these numbers to help calculate the reality of where these people are financially. And I think the reasoning that led to Mueller deciding what it did is because there's no property interest in Social Security. As I am hitting David all the time, it's not going to be there, they tell you, you know, in so many years, and that to use in your statement, you're not considering it, but you are using it to say, this is your total income, even though the Social Security rules would say, no, it's not your income, it's not speculative, if you have no right to Social Security, it's going to be there, or it's not. Wouldn't that bring us back to the change in circumstances you were talking about earlier, and come in and say, hey, but Judge, the Fed's cut off my Social Security, so I need my maintenance obligation. It could, and that would bring back to Mueller saying, you can't. I understand your argument, and it makes logical sense. What I think Mueller was saying is, logical sense, unfortunately, is left up to Congress, because this is a federal scheme in a federal system, and we simply can't change their rules. But I'm trying to figure out how anybody construes this hypothetical as changing Congress's rules. It's a question of whether or not you think that's legal process. If you think a court proceeding saying, we are going to consider your Social Security as part of your gross income, is that proceeding a legal process? I would submit that, how could you say otherwise? If the state of Illinois is going to say, you owe your spouse this much money, based on the totality of your income, including Social Security, which the federal government says, don't consider, I think that that would have to be considered a legal process. And a recent question, can the federal government tell the state what they can and can't consider in maintenance? There's some federalism issues there, too. If Social Security say, the federal government say, no, states, you can't consider that under your laws as income for maintenance purposes. Where does that authority come from? I think the reason that you threw up your hands, Justice, is the same reason that the Supreme Court threw up their hands and said, well, we understand that this is bad. And they even say in that ruling, wow, somebody's really taking it in this one, and we understand it's not fair, but, you know, we have elected officials in Congress who should change this and do something like you say or do something to say. And it can be done as simply as saying, state courts have the right to consider this. And I think the Supreme Court was just concerned that this is, in fact, a federal issue, a supremacy clause issue and a federalism issue. And I think they just threw up their hands and said, let's let them figure it out. Unless there's no other questions. Thank you. May it please the Court, Justices, Counsel. My name is Chuck Urban. I'm the attorney for the appellee, Rebecca Woolsey. I'd like to start off with first addressing your question, Justice Carter, to opposing counsel regarding the courts following the 504A guideline factors in reaching its determination as to the duration of maintenance. Counsel stated that those factors were not stated in the order. In fact, they are. They are appended to the order because the entire transcript of the court's ruling is made a part of that order. The court was very explicit in the record from pages, come along record pages 417 to 421, the court went through all the 504A factors. Prior to that, on page 412, the court indicated preliminarily as at the beginning of its giving its opinion that it was going to give its opinion and then state the reasoning under 504A. What page are you looking at? Common law record 417 through 421. When we typed up the order, we didn't put it in the order specifically because we incorporated the transcript. So that's why it doesn't appear in the face of the order, but it is incorporated as part of the transcript. But I'm looking at pages, where are the fragments of the deviation? The court basically runs through all of the 504A factors. I've read those things. I'm trying to find out where they are. Starting at page 417, let's see. He starts off by saying now in determining a maintenance award is appropriate, I consider all the factors in section 504A and then basically from there on is going through all of those factors. If you go back to 412, the judge, I believe he says at 411, he says here's the ruling. I'll speak to it as to my considerations, which the statute says I should, but at the outset and then goes on to describe what his actual ruling was before he stated the supporting factors. And that included the court's deviation. I see that stuff, but why don't you go to a page where he's talking about factors. Sure. Starting on page 417, I've considered the needs of the party. Each would have needs. So that's, I believe, the first statutory factor under 504A. I've considered the realistic and present future and earning capacity of each party. And then he goes on to explain his findings in that regard. He also describes the impairment of the present and future earning capacity of the party seeking maintenance due to the party devoting time to domestic duties, etc. And describes his findings with respect to that. He goes into the time necessary to enable the party seeking maintenance to acquire appropriate education, training, and employment, and so on, and goes through his findings on that factor. He states he considered the standard of living established during the marriage and goes through his findings on that factor. He states he considered the duration of the marriage. He goes through his findings on that factor. He states, summarizing the conclusions, where does he talk about the deviation? Well, Your Honor, like I said, he originally prefaced his ruling on the fact that he was going to state the factors supporting his ruling at the end after he gave the ruling. So he gave the ruling on the deviation and then he went through the statutory factors. Now, can I point to an instance where he says, I specifically deviated because of this factor? No, he did not say that. I agree. But he did, nonetheless, go through all the factors after stating that he would go through the factors after he had given his ruling. So I think it's clear that the court considered and applied those factors and stated a reason for his ruling. And when you discuss deviation, you're talking about the deviation for the date the permanent maintenance began. Correct. And that's on 4-12. He does state that time frame. Correct. It's to begin the next day, but he doesn't explain why. Until he goes through the statutory factors. Yes. Now, on the issue of maintenance in general, of course, as counsel correctly indicated, it's an abusive discretion standard. What counsel did not go through was what really amounts to the overwhelming evidence that supported the court's finding and should lead to this court's conclusion that the court did not abuse its discretion in determining, as it did, that Mr. Woolsey's change of employment status was in bad faith. I'm going to use the phrase change of employment status. I'm not going to use the phrase retirement. Retirement is not what happened in this case, and I'll go through that in a second. First of all, the court made a very specific finding, and I don't have this happen in my cases very often, where a court actually makes a finding that he specifically found Mr. Woolsey not to be credible. And he stated the reasons for it very clearly in his opinion. The court also focused on the timing of Mr. Woolsey's claimed retirement in regard to when it occurred. Mr. Woolsey announced in open court on the day that the property settlement was entered into, on the record, that he was going to retire the next day. Immediately thereafter, the evidence reflected that Mr. Woolsey began sending a series of emails to Ms. Woolsey where he reiterated his threat to retire, where he reiterated that if I retire, you're going to lose all your benefits. Now bear in mind, this is in the face of a man who is subject to a temporary order of support. He wasn't filing a petition to modify that temporary support. He's threatening to retire. Well, as it turns out, Mr. Woolsey did not retire. Mr. Woolsey changed his status with Thrivent, his employer. His original status was a financial associate. He changed his status to an assistant financial associate. He still remained in the employ of Thrivent as an assistant financial associate. He signed new contracts effective January 1, 2016, I believe is the date, to remain as an assistant financial associate. He did not, in fact, retire. Now, Mr. Woolsey will hide behind the process that he presented at the trial court level to claim that, well, I did what Thrivent says you should do when you want to retire from Thrivent. And this is what I did, and that's why I'm considered retired. Unfortunately, that does not offer Mr. Woolsey a shield because Mr. Woolsey did not, in fact, follow that process. That process provides for an ongoing source of income, an infinite ongoing source of income, for a financial associate who wants to wind down their practice. It does not require that person to divest themselves of all of their book of business, their clients, of which Mr. Woolsey had approximately 400. It does not require that individual to divest themselves of their managed fee clients, which created a substantial amount of income for Mr. Woolsey. But what did Mr. Woolsey do? He assigned 100 percent of his income to his partner by contract. He assigned all of his lucrative management fee clients to his partner. Mr. Woolsey claimed that, well, I couldn't get any compensation from my partner for those because the law prohibits it. But both Mr. Woolsey and his partner acknowledged that in exchange for those managed fee client fees, Mr. Woolsey wasn't paying rent any longer for the office space that he was continuing to use for this Thrivent office shared with Mr. Yocum, his business partner, as well as, coincidentally, Mr. Woolsey's daughter. Who he brought in approximately one month as a financial associate to that Thrivent office, approximately one month before he threatened to retire. Mr. Yocum testified in his eminence deposition that Mr. Woolsey has the opportunity to enter into what are called split fee contracts with his daughter if he wishes to do so. And that's typically the process that these individuals use when they are trying to wind down their practice. They bring someone in, it lowers the amount of work they have, they send these people under them out to do the work, and then they split the fee on the contract with them. Mr. Yocum suspected that there were split fee contracts between Mr. Woolsey and his daughter. So what we have here is the trial court had ample evidence to show that this wasn't, in fact, a retirement, that this was just a change of status. The court also looked at, well, what is the timing of this change of status? What is going on here? Well, we've got an individual who's in the midst of a divorce proceeding. We've got an individual that has a temporary child support obligation. He has a temporary maintenance obligation, well, temporary unallocated support obligation, I should say. He has an obligation to provide health insurance for both his wife and his daughter. By reason of his change of status, that health insurance was gone. Because he no longer was entitled to insurance based on being an associate financial associate as opposed to a financial associate. I'll go into more about that in a moment. His assignments, as I indicated, of all this income to his partner and his daughter were not required. And they were not consistent with the usual course of action for someone in Mr. Woolsey's position that wishes to wind down their practice. The evidence also reflected, and the trial court considered, the fact that Mr. Woolsey had the option to return back to his original status if he wanted to do so. It was up to him. Thrive End is always looking for financial associates. It's like a light switch. Mr. Woolsey turned it off when it suited him. When he's ready for it to suit him the other way, he has the ability to turn it right back on. Evidence was presented that with Thrive End's approval, Mr. Woolsey could get back his clients. He could get back his managed fee clients. There was evidence presented as to what the party's retirement plans were in relation to the fact that they bought an expensive home, spent a considerable amount of money on a home, took out a mortgage on the home, and it was a balloon note. The testimony was that as soon as the party's child graduated from high school and started attending college, which coincided with the maturity of the note on this mortgage, they would sell the house and move to somewhere warm is, I believe, what the testimony was. So there was a plan in place that Mr. Woolsey had anticipated, that he would continue to work for Thrive End, that he would pay for this house, that he would support his family, and then when the child left for college, then he would, quote, unquote, retire, and he would continue to earn income from the clients that he had built up. That was his intention. That was the testimony. Were those marriages lasted two years? No, it was longer than that, Judge. I don't know. I couldn't tell you off the top of my head. It's in the record. I'm sorry. As far as Mr. Woolsey's health issues, the court considered the fact that the evidence reflected, by reason of the medical records that were presented, that as of the end of 2015, Mr. Woolsey had fully recovered from his C. diff infection, and he was back to work. It reflected that the gout that he had was being managed satisfactorily with medication. Another thing that we noted was that his medical records in his history, he was questioned about whether he suffered from anxiety or depression, and the medical records indicated that was negative for anxiety and depression. There was no evidence other than Mr. Woolsey's testimony presented that there was any type of psychological problem going on. But according to what Mr. Woolsey apparently told his own doctor, he was not suffering those problems as of the end of 2015, as he was claiming. Thank you. On the issue of imposing a presumptive retirement age, I don't think this court wants to go there. That is not something that is amenable to a bright-line test. This is a case that illustrates why courts shouldn't do that. The trial court had plenty of evidence before to show that this individual's change of status was in bad faith, was specifically intended to avoid his obligation to provide support for his daughter and his soon-to-be ex-wife, both from the standpoint of his obligations under the temporary order and from the potential obligation going forward, certainly for child support and possibly for maintenance. As far as the amount of maintenance that was awarded in this case, I think the record is clear. The court clearly appropriately looked beyond Mr. Woolsey's tax return, which was his only evidence as to what his income was as he presents his tax return. His tax return was very misleading. He's a statutory employee. He reports part of his wages from the same source as W-2 wages and as 1099 wages. The 1099 wages are already reduced by his voluntary retirement contributions, his voluntary health savings contributions, and his voluntary health insurance and long-term care premiums, which are all personal in nature. So if you looked at his tax return, that Schedule C is going to be short of those amounts, and it's not going to show his true gross quote-unquote business income. So the trial court was accurate on that. The court properly deducted the car and cell phone expenses, which by the testimony of Mr. Woolsey were clearly personal in nature, and he was unable to differentiate what was between business and cell phone. The rental properties, the court properly looked at the distributable net tax, excuse me, distributable income as opposed to the taxable income because the distributable is what his actual cash flow was. The court properly used a three-year average due to the variance in that over the period of the last three years. On amputation, I agree wholeheartedly with counsel's statement as to the three factors that the court was required to consider, and I think the court hit on every one of them. There was evidence on every one of them. It was overwhelming in this case. There's simply nothing to suggest that the amputation of income was inappropriate. There was evidence of intentional manipulation of income. The fact that Mr. Woolsey gave up 100% of whatever he was going to bring in to his business partner, the fact that he gave up managed fee clients, the fact that he brought his daughter in. Unequivocal evidence of that. The trial court was reasonable in concluding that Mr. Woolsey was not credible regarding his voluntarily reduced income and inability to return to his income production for 2016, the following year, or that other arrangements possibly existed between Mr. Woolsey and his partner and his daughter, the prospectus saying. As far as the maintenance beginning and duration periods, we've gone into that. I won't go into that any further other than to say that with respect to termination date, the court said two years, nine months. So the court doesn't have to say, well, it ends at two years. The court said it is for the duration of two years, nine months. So we know what's going to happen at the end of two years and nine months. Mr. Woolsey isn't going to be paying anymore. But what the court didn't do was create a permanent termination, which the court would be entitled to under the new maintenance statute because it's a marriage of less than two years. The court found that that would not be appropriate in this case based upon its consideration of the five foray factors which are set forth in the transcript. This is a case where because of Mrs. Woolsey's needs, because of her potential and because of Mr. Woolsey's potential resumption of income production, given his means to do so and his need to do so in light of his income versus his stated expenses on his financial affidavit, the guy has a huge shortfall. And he's going to have to do something to make that up. Thank you. Nothing further, Your Honor, unless you have any questions. Does it make it reviewable? You didn't say reviewable, right? Correct. Correct. But it would still be subject to modification. So it gives Mrs. Woolsey the opportunity to file a petition to modify prior to the end of two years, nine months, if a substantial change of circumstances occurs. You didn't use any of the normal language like permanent maintenance, reviewable maintenance. None of the normal language you see in maintenance orders. Right. Well, the new statute kind of puts us in that position, Your Honor. Any of the languages on the last 50 years, right? Basically. It creates an interesting situation. I mean, they were married in late 07, if my memory serves me correctly. Yeah, their second marriage, correct. Yeah. And they separated in late 2010 or something like that. Correct. Correct. They had no divorce until. . . And they have a 13-year-old child. Until about 20. . . By adoption. By adoption, correct. And by 2016, I think it was, late 2016, when the final divorce was. . . Yes, that's correct. Yeah. Thank you, counsel. Thank you, Your Honor. And I just conclude by asking the Court to affirm the trial court on all counts. Thank you very much. Counsel. Counsel, discuss the 504A factors. There's been no complaint from the appellant about the factors. The discussion was deviating from the statutory guidelines, which is language from the statute. Your Honor just mentioned none of the language that would have appeared in these orders from 50 years on about permanent maintenance and review. That wasn't in there. That language still exists in the statute. The trial court had the option to say, no, I'm not going to follow the guidelines. This is going to be permanent maintenance. Or under another section to say, I'm not going to order a termination date. There's going to be a review date. Those are sections of the statute. The trial court could have done that, and the trial court did not. That is why there's nothing in there about saying we're going to deviate from the guidelines. Reading out the 504A factors isn't deviating from the guidelines. That's following the direction of the statute. It says, you have to say, here's what I've considered in making my ruling. The same way that the court would have to say, here's why I'm deviating from the guidelines. I think the statute actually says, you have to say, here is what the statute says I should do, given the length of the marriage, and then orders the trial court to say, here's why I'm not doing that, and then here is my order. The trial court didn't do any of those things. You have to give reason for deviating. Correct. The other section is you have to make findings with regard to what things you were considering. You make specific findings with regard to the factors on the 504, and the other things that you were considering when you were awarding maintenance. Correct. That's part of the statute. And finding the maintenance amount. I think those are separate instances of the duration versus the amount. Those are factors that the courts go into. Although there is a case law that I think is the name of the case on the Supreme Court saying you don't have to make explicit findings. So you find a lot of generic findings from trial courts like this. But when you make an argument saying that our court should make some kind of overreaching timeline, like a magic retirement date, isn't that like legislating from a, isn't this more of a question whether or not this was an abuse of discretion to say that this was in bad faith or not, or against manifest way the evidence to say this. That's really the question here. It's not to reach out and say, we, the third district, now determine anybody at age 68 before, but 68 and beyond, you can retire. That's what you want us to do. It is. I think that is the most workable issue. Because what we have now are courts saying, you shouldn't retire at this age. And the other one says, no, that is a customary retirement age. That works. The problem, and this court can certainly say, is that in Ray Smith, that those factors shouldn't apply to someone who's at this age because they're not workable. Even without a bright line rule, if those are still the factors that we're looking at, they just don't apply to someone who's retiring at that age. I can't see a situation where we're always going to say, well, we need to look at the timing of the retirement. Well, here we are in a dissolution case. You retire during the dissolution. That's going to be in every single retirement during a dissolution case automatically, because the only time you're going to look at these factors is if there's a retirement during a dissolution. It seems logical that that could be one of the factors you look at. You're in the middle of a really hotly contested litigation, a divorce. That's when you retire. It makes sense for the individual in Smith who was 54. It doesn't make much sense in this case when he's 68 when the trial court... That's another factor. What year do you want us to pick? I think that age 60... I don't think it matters what age you specifically pick, because the court is always going to have the opportunity to say, we're going to review this if circumstances change. Counsel's argument that he didn't actually retire. Well, he didn't actually retire because he's a contractual employee and he has to follow this. He's now an associate, even though he doesn't own any business. He never owned any business. It was all thriving business. How old was he when the dissolution proceedings began? He would have been in his 60s. I think he probably was 64. I think off the top of my head, I don't know. I'll have to go back and look at the numbers. So if you want us to pick a retirement date of 62 or 60, he'd already passed that during the marriage. And if he was continuing to work, he would still have to pay maintenance based on that. But he would have to come back in under changing circumstances and say, no, now I am retired. Now I need to modify my maintenance. Now the issue in this case is he made the decision to retire during the dissolution proceeding, which obviously is going to be different. So under your right-hand rule, if the person was 68 and they retired during the divorce, then they automatically no imputed income? No impute. That's the only issue is whether or not they can impute what you could have earned had you kept working. Okay, so if this right-hand rule you want, there would be automatically, okay, he's 68, doesn't matter, no imputed income, period. Maintenance would be based on his retirement income, not what he could have earned had he not retired. Regardless of any other circumstance. Regardless of any other circumstance? Well, no. I mean, if there's fraud, obviously there's going to have to be a change. But, again, if this is... I don't think we do. I think what we have now is a case that was decided based on someone who was 54 years old being applied to people who are clearly at an age where, were they married, no one would question that he could retire at age 68. If they were married and he said, oh, I'm 68, I'm going to retire, nobody's going to say, why aren't you still working? Nobody would say that. The only reason it comes up is because he was in a marriage. Labor versus if you're a professor or a judge, one, you don't have Alzheimer's. I think it would matter based on some of the occupations like police officer or a fireman or any of these jobs where you put in a certain number of years, you get your retirement pension, and you want to retire. Certainly in those circumstances, you could say that they could retire at an earlier age. But I think there needs to be a number at the top that says, you know, as a society, we're going to say you're entitled to make that decision. And, yeah, if it's going to reduce your spouse's earnings, it was going to reduce their earnings if you were married. That's the logic used in the Massachusetts Supreme Court case and the California Supreme Court case is that the public policy is to strengthen marriage. We don't want a situation where the divorced spouse is making more money when they're divorced versus what they would make when they're married. Well, usually when it's society decisions, it's usually the legislature. You spend your off hours lobbying the General Assembly. If we don't, you're going to have a lot more of these cases as society ages and we have these later in life divorces. You're going to have the same situation that we have now coming to this court. That's the beauty of being a man. Maybe more. Thank you. We'll take our recess now for a panel change.